UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NURCA MELVA CABRERA,

    Plaintiff

v.

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.

Civil Action No. 15-10714

HON. JOHN CORBETT O'MEARA
U.S. District Judge
HON. R. STEVEN WHALEN
U.S. Magistrate Judge

_____/

## REPORT AND RECOMMENDATION

Plaintiff Nurca Melva Cabrera brings this action under 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act. Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, I recommend that Plaintiff's Motion for Summary Judgment be GRANTED to the extent that the case is remanded for further fact-finding, and that Defendant's Motion for Summary Judgment be DENIED.

## PROCEDURAL HISTORY

On April 10, 2012, Plaintiff filed applications for DIB and SSI, alleging an onset date of June 11, 2007 (Tr. 126-136). After the initial denial of her claim, Plaintiff filed a request for an administrative hearing, held on September 10, 2013 in Livonia, Michigan before

Administrative Law Judge ("ALJ") Martha M. Gasparovich (Tr. 31). Plaintiff, represented by attorney Katherine Fortune, testified (Tr. 35-49), as did Vocational Expert ("VE") Helen Topcik (Tr. 49-54). On October 1, 2013 ALJ Gasparovich found Plaintiff could perform her past relevant work as a cleaner (Tr. 23-24). On December 24, 2014, the Appeals Council denied review (Tr. 1-3). On February 26, 2015, Plaintiff filed for judicial review of the Commissioner's final decision in this Court.

## BACKGROUND FACTS

Plaintiff, born November 11, 1956, was age 56 when the ALJ issued her decision (Tr. 24, 126). She received a GED and worked previously as a baby sitter, cashier, cleaner, and home health aid (Tr. 164). She alleges disability resulting from diabetes, asthma, hypertension, hyperlipidemia, depression, and insomnia (Tr. 163).

### A. Plaintiff's Testimony

*Before beginning her testimony, Plaintiff amended her alleged onset of disability date to November 11, 2011* (Tr. 34-35).

Plaintiff offered the following testimony:

She lived in Pontiac, Michigan (Tr. 35). In 2003, she worked as an office cleaner and in 2000 and 2001, for another company as an office cleaner (Tr. 36). She currently worked as a part-time daycare specialist for three children, ages 10, 10, and 12 (Tr. 36). Her job was to make them a snack when they arrived home from school and ensure that they did their homework (Tr. 36). She made approximately $300 a month (Tr. 36-37).

She was unable to perform the daycare activities on a full-time basis due to sporadic headaches and backaches (Tr. 37). The children she cared for were her grandchildren and thus, she was able to "relax on the couch" for 15 minutes when needed (Tr. 37-38). She lacked the energy to care for other children that would typically be "jumping around" (Tr.

37-38). She was unable to perform full-time work due to symptoms of diabetes, depression, headaches, back pain, asthma, and diabetes-related left eye vision problems (Tr. 38). She could not read newspaper print and used "mostly" her ears to follow television programs (Tr. 39).

She currently received treatment for diabetes, back pain, arthritis of the neck, and headaches (Tr. 39-40). She took medicine for hyperlipidemia, diabetes, headaches, depression, arthritis, and panic attacks (Tr. 40). She experienced insomnia but did not take naps during the day (Tr. 40-41). Plaintiff was unable to stand or sit for more than 15 minutes without back pain (Tr. 41). She was unable to walk for more than one block (Tr. 41). She was unable to lift more than 10 pounds (Tr. 42). She was able to wash clothes, but her son did the vacuuming and helped her with the cooking (Tr. 42). She had failed to pass the vision test the last time she went to renew her driver's license and now was unable to drive (Tr. 42-43). She relied on cabs or her niece for transportation (Tr. 42-43).

Plaintiff was "constantly tired" and she experienced problems remembering when to take certain medicines (Tr. 43). She did not experience problems remembering to make snacks for her grandchildren, but sometimes relied on her son to prepare the snacks (Tr. 44).

In response to questioning by her attorney, Plaintiff testified that her back pain started in her neck and ran downward (Tr. 44). She stated that on a scale of 1 to 10, she experienced level "10" pain on a daily basis (Tr. 44-45). She reported that she had recently begun treatment with a neurologist (Tr. 45). She indicated that she checked her blood sugar four times a day due to diabetes (Tr. 45-46). She reported sugar levels of 240 by noon (Tr. 46). She testified that she ate small portions of food and avoided fried food (Tr. 46). She reported symptoms of diabetes which included vision problems and constant foot numbness (Tr. 46-47). Despite hand surgery the previous year, Plaintiff indicated that she experienced bilateral

finger numbness (Tr. 47). She reported that she required the use of a sitting cart when doing her grocery shopping (Tr. 47-48). She denied problems performing personal care activities (Tr. 48). She reported the medication side effects of whole body numbness and dizziness (Tr. 48). She was prescribed Cymbalta but was not receiving mental health care (Tr. 49). She reported that depressive episodes, occurring approximately five days a week, made her feel lonely and misunderstood (Tr. 49). She testified that she had struggled with depression for "years" (Tr. 49).

### B. Medical Evidence[1]

#### 1. Treating Sources

February, 2008 records show a blood sugar reading of 222 (Tr. 358). In March, 2008, Plaintiff sought emergency treatment for an earache (Tr. 288). Treating records note a history of diabetes, depression, and asthma (Tr. 288). Plaintiff's blood sugar levels during inpatient treatment for mastoiditis the following month include readings of 189 and 248 (Tr. 329-344). Discharge records note a diagnosis of depression (Tr. 322). Upon discharge, she was re-prescribed Elavil (Tr. 315, 324). In August, 2009, Plaintiff sought treatment for diverticulitis (Tr. 250). The following month, Plaintiff's blood sugar reading was 159 (Tr. 237). March, 2010 emergency room notes state that a recent injury was attributable to vision problems caused by diabetes (Tr. 223). May, 2011 emergency room notes state that Plaintiff was currently taking Cymbalta and had a history of depression (Tr. 215).

March, 2012 ophthalmological records note multiple hemorrhages in both eyes (Tr. 408). Plaintiff scheduled an "urgent visit" to her ophthalmologist in August, 2012, noting that she was "unable to see faces" (Tr. 398). In October, 2012, Jeffrey E. Golosh, D.O.

---

[1] Medical evidence predating the alleged onset of disability by more than one year has been reviewed in full, but is not included in the present discussion.

administered a steroid injection to the left wrist after imaging studies showed de Quervain's tenosynovitis or tendinitis (Tr. 385-386). He noted a positive grind test (Tr. 385). Later the same month, he found left-sided CTS (Tr. 384). He prescribed a gel wrist splint (Tr. 384). The following month, ophthalmological records showed blurry vision (Tr. 396). Plaintiff reported a blood sugar level of 130 (Tr. 396). In December, 2012, she underwent left extensor tendon tenolysis, abductor pollicis longus, and extensor pollicis brevis without complications (Tr. 380). Followup notes from later the same month note "markedly decreased pain" (Tr. 378).

In February, 2013, ophthalmologist Robert Blau, M.D. found that Plaintiff's remaining vision in her better eye after best correction was 20/200 or less (Tr. 410). The same month, Plaintiff sought emergency treatment for chest pain (Tr. 447). Treating records noted uncontrolled hypertension, diabetes, and depression (Tr. 446). A blood sugar reading was 207 (Tr. 455). April, 2013 laser surgery for retinal photocoagulation was performed without complications (Tr. 414). In July, 2013, Dr. Blau noted that imaging studies showed hemorrhages (Tr. 458). The neurologist Bharat Tolia, M.D. noted Plaintiff's reports of daily headaches and "on and off" back pain (Tr. 467, 478, 484). Dr. Tolia observed a normal range of motion in all extremities and a normal gait (Tr. 468, 479, 485). An x-ray of the cervical spine showed multilevel degenerative changes (Tr. 474-475). An x-ray of the lumbar spine showed abnormalities at L5-S1 (Tr. 476). The following month, Dr. Tolia noted that imaging studies showed bilateral CTS (Tr. 464). He noted that Plaintiff exhibited cognitive difficulties (Tr. 473).

Dr. Tolia completed a Residual Functional Capacity Questionnaire, finding that Plaintiff experienced chronic lumbosacral spine pain and weakness as well as chronic headaches (Tr. 482). He found that Plaintiff was unable to lift more than 10 pounds or

perform fine manipulations or grasp for more than 20 percent of the workday (Tr. 483). He found that Plaintiff would be required to miss more than four days of work each month (Tr. 483). He found that she was incapable of full-time work (Tr. 483).

## 2. Non-Treating Sources

In June, 2012, psychiatrist Atul C. Shah, M.D. performed a consultative examination on behalf of the SSA, noting Plaintiff report of long-term depression (Tr. 363). Plaintiff reported crying jags, mood swings, and isolative behavior (Tr. 363). She reported that Cymbalta helped her depression but that the condition waxed and waned (Tr. 364). Dr. Shah found that she had a tendency to minimize her symptoms (Tr. 364). Plaintiff was unable to perform two out of three simple calculations or analyze proverbs (Tr. 364). Dr. Shah found that Plaintiff had a major depressive disorder with a fair prognosis (Tr. 365). He found that she was unable to manage her benefit funds (Tr. 365). He assigned her a GAF of $60^2$ (Tr. 365).

The same month, Ernesto Bedia, M.D. performed a physical examination on behalf of the SSA, noting Plaintiff's report that "stress and pollen" triggered asthma (Tr. 368). She reported that her blood sugar readings were "usually over 200" (Tr. 368). She denied hospitalizations for diabetes-related symptoms (Tr. 368). She denied changes in vision (Tr. 369). Dr. Bedia found that Plaintiff's diabetes was "not controlled well," noting her report of frequent thirst and urination and signs of paresthesias (Tr. 370). He noted a stable gait (Tr. 372).

---

[2] A GAF score of 51–60 indicates moderate symptoms OR moderate difficulty in social, occupational, or school functioning. *Diagnostic and Statistical Manual of Mental Disorders—Text Revision* ("*DSM–IV–TR*"), 34 (4th ed. 2000).

Later in June, 2012 B. D. Choi, M.D. performed a non-examining review of the treating and consultative physical conditions, finding that Plaintiff's physical conditions were non-severe (Tr. 59). In July, 2012, Ashok Kaul, M.D. found that Plaintiff's psychological impairments were non-severe on the basis that Plaintiff had not sought formal "psych treatment" and was able to provide daycare services (Tr. 60).

### C. Vocational Expert Testimony

VE Helen Topcik classified Plaintiff's previous work as a babysitter as semiskilled at the medium exertional level; home health aide, semiskilled/medium; and cleaner, unskilled/light[3] (Tr. 51). The ALJ then posed the following question, taking into account Plaintiff's age, educational level, and work experience:

> Assume an inability to stand and walk . . . more than six hours in an eight-hour day. The individual could lift no more than 20 pounds occasionally, and 10 pounds frequently, should not require the use of depth perception, could not require fine close work such as a barber, machinist, or a needle worker, would need to avoid operating vehicles or moving machinery, and there could be no prolonged visual vigilance. Also, the individual would not be able to perform forceful gripping or twisting with the hands bilaterally. Could such an individual perform any of the work you have described as [Plaintiff's] past work? (Tr. 51).

The VE testified that the individual could not perform the work of a babysitter or home health aide but could perform Plaintiff's past relevant work as a cleaner or cashier (Tr. 51-52). The VE testified further that if the individual were required to take unscheduled 15 to 20 minute breaks every workday, all gainful employment would be precluded (Tr. 52).

---

[3]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

The VE stated that her testimony was based on the information found in the *Dictionary of Occupational Titles* ("*DOT*"), except for the testimony regarding unscheduled breaks which was based on her own professional experience (Tr. 52). She stated that if the original hypothetical question were amended to limit the individual to "simple routine tasks in a low stress environment defined as not quick decision-making, and no quick judgment required on the job, . . . no interaction with the public, and only minimal interation with co-workers," the cashier job would be eliminated but the individual could work as a cleaner (Tr. 53).

In response to questioning by Plaintiff's attorney, the VE testified that if the same individual had a "sit/stand" option allowing her to change positions every 15 minutes, the cleaner job would be eliminated (Tr. 53). The VE stated that two or more absences a month, or, the need to be habitually off task more than 10 percent of the time would preclude all work (Tr. 54).

### D. The ALJ's Decision

Citing Plaintiff's medical records, the ALJ determined that Plaintiff experienced the severe impairments of "loss of vision, left eye; diabetes mellitus II; status post left extensor pollicis longus, extensor pollicis brevis extensor tenolysis; bilateral carpal tunnel syndrome; left thumb carpometacarpal joint arthritis; and degenerative disc disease" but found that none of the conditions met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 16-17, 19). The ALJ found that Plaintiff retained the residual functional capacity ("RFC") to perform light work with the following additional restrictions:

> [C]laimant can stand and walk no more than six hours in an eight-hour workday. The claimant could lift no more than 20 pounds occasionally and 10 pounds frequently. The claimant is limited to work that does not require the use of depth perception, or fine, close work such as a barber, machinist, or needle worker. The claimant would need to avoid operating vehicles or moving machinery. There could be no prolonged vigilance. The claimant could not perform forceful gripping or twisting with the bilateral hands (Tr. 19-20).

The ALJ found that Plaintiff could perform her past relevant work as a cleaner (Tr. 23).

The ALJ discounted Plaintiff's allegations of disability (Tr. 21-22). She noted that Plaintiff's report of blood sugar levels of 200 contradicted her ophthalmologist's notes stating blood sugars of 102 to 140 (Tr. 21). She noted that while Plaintiff experienced proliferative diabetic retinopathy, her vision improved after laser surgery (Tr. 21). The ALJ observed that the complaints of hand pain had been addressed as of December, 2012 (Tr. 21). The ALJ noted that x-rays of the lumbar spine were unremarkable (Tr. 22). She observed that Plaintiff acknowledged "no problems with personal care," and that she was able to cook, clean, do laundry, shop for groceries, and enjoyed "listening to the radio and watching television" (Tr. 22). She noted that Plaintiff was able to work part time as a daycare provider to her grandchildren (Tr. 22). The ALJ discounted Dr. Tolia's disability opinion, noting that he examined Plaintiff only twice before issuing the opinion and that his opinion was "grossly inconsistent with the longitudinal medical evidence revealing only limited treatment" (Tr. 22). She found further that Dr. Tolia's opinion was not consistent with his own "relatively minimal examination findings" (Tr. 22).

## **STANDARD OF REVIEW**

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way,

without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## **FRAMEWORK FOR DISABILITY DETERMINATIONS**

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

### A. The RFC

Plaintiff argues first that the RFC crafted by the ALJ is based on an erroneous interpretation of the medical evidence. *Plaintiff's Brief,* 11, *Docket #16.* She points out that the ALJ's finding that her vision improved after laser surgery is unsupported by an actual assessment of her visual abilities. *Id.* at 12. She notes that while the ALJ rejected Dr. Tolia's opinion on the basis that he examined Plaintiff only twice, the transcript does not include another opinion regarding the functional limitations. *Id.* She also contends that the RFC understates the limitations as a result of CTS. *Id.* at 13. She assigns error to the ALJ's finding that the condition of depression was non-severe. *Id.* at 13-14.

The RFC describes an individual's residual abilities. *Howard v. Commissioner of Social Security,* 276 F.3d 235, 239 (6th Cir. 2002). "RFC is to be an `assessment of [Plaintiff's] remaining capacity for work' once her limitations have been taken into account" *Id.* (*citing* 20 C.F.R. § 416.945). In determining a person's RFC, it is necessary to consider (1) objective medical evidence as well as (2) subjective evidence of pain or disability. 20 C.F.R. § 404.1545(a)(1)(RFC must be based on all "relevant evidence"). The RFC must consider the alleged physical, mental, and environmental restrictions. § 404.1545(b-d).

The ALJ acknowledged some degree of visual limitation in RFC by precluding work that did not require "the use of depth perception, or fine, close work such as a barber, machinist, or needle worker" (Tr. 19-20). The ALJ supported the lack of a more stringent restrictions by noting that Plaintiff's vision problems resulting from complications of diabetic retinopathy were resolved with laser surgery (Tr. 21). She cited treating notes stating that Plaintiff's vision improved after April and May, 2013 laser treatments (Tr. 21).

However, the ALJ's own summation of Plaintiff's eye problems shows that the vision problems were not permanently resolved by laser surgery. As noted by the ALJ, while Plaintiff underwent laser surgery in March, April, and August, 2012, October, 2012 records note decreased visual acuity and a new vitreous hemorrhage (Tr. 21). Plaintiff again reported vision problems the following month (Tr. 396). While Plaintiff underwent additional laser treatments in April and May, 2013, later records show that she again developed another vitreous hemorrhage (Tr. 21).

The ALJ noted that records following the May, 2013 surgery showed 20/30 vision in one eye and 20/70 in the other (Tr. 21). The ALJ cites these findings for the conclusion that Plaintiff's eye problems had essentially resolved. To the contrary, the discovery of the most recent hemorrhage suggests that an already-established pattern was repeating itself once more: hemorrhage, followed by several months of poor vision, laser surgery resulting in temporarily improved vision until another hemorrhage restarts the cycle (Tr. 396, 398, 408, 410, 414, 458). Notably, while Plaintiff underwent surgery in May, 2013, she was already experiencing severe left eye vision limitations at the time of the September, 2013 hearing (Tr. 38). She testified that she was unable to pass the vision requirement to renew her driver's license, could not read newspaper print, and followed television shows with her "ears" due to poor vision (Tr. 39, 42-43). The record shows that Plaintiff experienced significant, if not outright disabling visual disturbances during the months following a hemorrhage and before surgery, including the inability to "see faces" (Tr. 398). The RFC preclusion on "the use of depth perception, or fine, close work such as a barber, machinist, or needle worker" is inadequate to describe Plaintiff's visual limitations (Tr. 19-20).

Likewise, the RFC, precluding "forceful gripping or twisting with the bilateral hands" does not adequately reflect Plaintiff's manipulative limitations (Tr. 20). The ALJ downplayed August, 2013 EMG studies showing the condition of bilateral CTS by noting that the studies were otherwise normal (Tr. 21, 464). However, Plaintiff's testimony of bilateral finger numbness is wholly consistent with the diagnosis of CTS (Tr. 47). While the ALJ rejected Dr. Tolia's findings on the basis that they were not supported by the objective studies, his conclusion that Plaintiff was unable to perform fine manipulations or grasp more than 20 percent of the workday is not inconsistent with the EMG studies (Tr. 483). As noted by Plaintiff, Dr. Tolia's preclusion on repetitive hand and wrist movement is not contradicted by any of the examining or treating records.

Moreover, the ALJ's finding that Plaintiff did not experience a significant degree of psychological impairment is not supported by substantial evidence. First, in finding the lack of a mental impairment, the ALJ relied on the non-examining findings of Dr. Kaul (Tr. 18-19). While Dr. Kaul is correct that Plaintiff did not seek mental health treatment, the record shows that for some time, she apparently lacked access to *any* regular health care treatment. Records predating the onset of disability show that she went to the emergency room for health problems (Tr. 322, 350, 358). Despite the sparse treating history, March, 2008 inpatient records note that she was diagnosed with depression as well as physical problems (Tr. 322). The treating notes from 2008 forward show that she was prescribed either Elavil or Cymbalta for depression (215, 315, 324).

The lack of mental health records does not imply that depression did not create work-related impairments, but rather, suggests that she lacked the resources to obtain treatment for any of her conditions. For example, the ophthalmological records show that she did not seek treatment for retinopathy until after she had experienced multiple hemorrhages in both eyes

(Tr. 408). While the ALJ cited Dr. Shah's consultative examination notes to support her finding that Plaintiff did not experience a mental impairment, in fact Dr. Shah's observations, with nothing more, strongly support the finding that depression created some degree of work-related limitation. He apparently concluded that Plaintiff's report of isolative behavior, crying jags, and mood swings was believable, given that he found that she "minimized" her symptoms (Tr. 363-364). Notably, he found that Plaintiff lacked the wherewithal to manage her benefit funds and found that she had a moderate degree of psychological disfunction (Tr. 365). The ALJ error in omitting depression from the "severe" impairments at Step Two was compounded by the lack of reference to the condition in the RFC.

Because the RFC does not reflect Plaintiff's full degree of limitation due to vision problems, CTS, or depression, a remand is warranted for correction of these omissions.

### B. The Credibility Determination

Plaintiff argues further that the ALJ did not provide an adequate rationale for finding that her testimony was not credible. *Plaintiff's Brief* at 14-16.

Consistent with above discussion, the credibility determination relies on distortions, if not outright misstatements of the record. The ALJ faults Plaintiff for claiming blood sugar readings of over 200 to Dr. Bedia (Tr. 21). However, consistent with Plaintiff's claim, February, 2013 emergency room records state that Plaintiff's blood sugar was 207 (Tr. 455). Records from 2008 forward indicate that the February, 2013 reading was not a fluke. During a 2008 hospitalization, Plaintiff's blood sugar levels ranged between 189 and 248 (Tr. 329-344). Dr. Bedia noted that Plaintiff's diabetes was "not controlled well" (Tr. 370).

More generally, the ALJ's narrative understates the severity of the condition of diabetes. While she noted Plaintiff's report of the diabetes-related symptoms of thirstiness, frequent urination, and tingling in the legs, she inexplicably "discounted" the claims by

-14-

noting that the blood sugar readings reported to Dr. Blau were only moderately high (Tr. 21). However, Plaintiff's alleged symptoms are wholly consistent with the diagnosis of long-standing, poorly controlled diabetes. None of the treating records contradicts Plaintiff's reported symptoms. More remarkably, the ALJ prefaces the discussion of Plaintiff's treatment for diabetic retinopathy, hemorrhaging, and laser surgery by stating that "the record reveals no evidence of any specialized, intensive, or otherwise emergent care for diabetes mellitus" (Tr. 21). It is unclear why the ALJ does not believe that multiple laser surgeries for retinal hemorrhaging resulting from diabetes is not "specialized" care.

The ALJ's reliance on Plaintiff's daily activities to support the non-disability finding is also based on misstatements of the record (Tr. 22). While the ALJ found that Plaintiff's ability to care for her teenage son, cook, clean, and do laundry chores undermined the disability claim, Plaintiff testified that her teenaged son did the vacuuming and helped her with cooking because she could not lift more than 10 pounds (Tr. 42). While the ALJ cited Plaintiff's ability to care for her grandchildren in the afternoon in support of her non-disability finding, Plaintiff reported that she often relied on her teenaged son to prepare snacks and that she was able to "relax on the couch" for 15 minutes when needed because she was taking care of her own grandchildren rather than other people's children (Tr. 37-38, 44). While the ALJ noted that Plaintiff was able to shop for groceries, Plaintiff testified that she relied on others for transportation and once inside the grocery store, used a motorized cart (Tr. 47-48).

In support of the credibility determination, the ALJ also noted that Plaintiff enjoyed "listening to the radio and watching television" (Tr. 22). It is unclear how "listening to the radio" supports the finding that she could work on a full-time basis as a cleaner. Moreover, while Plaintiff testified that she watched television, her actually testimony states that she

"mostly" used her "ears" to follow television programs due to her poor vision (Tr. 39).

Finally, I note that the sparse treating records, juxtaposed against the seriousness of Plaintiff's conditions, appear to be attributable to her lack of financial resources rather than a lack of symptomology. Pursuant to SSR 96–7p, 1996 WL 374186, *7 (1996), an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." *See also* SSR 82–59, 1982 WL 31384, *4 (1982) (The ALJ must consider an individual's claim that she is unable to afford the prescribed treatment).

The transcript shows that Plaintiff customarily sought emergency room, rather than office treatment. The emergency care records indicate that Plaintiff did not carry insurance. While Plaintiff reported long-term back pain, the only imaging studies created were x-rays of the cervical and lumbar spine taken shortly before the hearing (Tr. 474-476). Despite the fact that the lumbar spine x-ray showed some level of abnormality at S5-L1, she did not obtain more detailed (but also more expensive) imaging studies such as a CT scan or MRI (Tr. 476). While the failure to seek timely treatment for diabetes, mental health care for depression, or further imaging studies for the back condition appears to be attributable to financial restrictions, the ALJ did not inquire as to the reason for Plaintiff's lack of aggressive treatment or make reference to her possible financial restrictions in the administrative decision.

### C. The Hypothetical Question

Finally, Plaintiff contends that the hypothetical question to the VE, mirroring the limitations found in the RFC, did not account for her full degree of physical and mental

limitation. *Id.* at 16-17.

Plaintiff is correct that a hypothetical question constitutes substantial evidence only if it accurately portrays the individual's physical and mental impairments.[4] *Varley v. Commissioner of Health and Human Services,* 820 F.2d 777, 779 (6th Cir.1987). While the Sixth Circuit has rejected the proposition that all of the claimant's maladies must be listed verbatim, "[t]he hypothetical question ... should include an accurate portrayal of [a claimant's] individual physical and mental impairments." *Webb v. Commissioner of Social Sec.,* 368 F.3d 629, 632 (6th Cir.2004).

Consistent with the above findings regarding the RFC, the hypothetical question to the VE did not adequately account for Plaintiff's full degree of limitation. To be sure, an ALJ is not required to include discredited findings or all of the claimant's allegations in the

---

[4] While an ALJ is not required to elicit vocational testimony in making a Step Four finding, the use of a VE is not prohibited. *Studaway v. Secretary of Health and Human Services,* 815 F.2d 1074, 1076 (6th Cir.1987); *Mays v. Barnhart,* 78 Fed. Appx. 808, 813–814, 2003 WL 22430186, *4 (3rd Cir. October 27, 2003) ("At step four of the sequential evaluation process, the decision to use a vocational expert is at the discretion of the ALJ"). While " 'the ultimate responsibility for making the necessary findings at [Step Four] rests with our adjudicators ... it is appropriate for our adjudicators to consider evidence from a VE ...' " *Merkel v. CSS*, 2008 WL 2951276, *3–4 (E.D.Mich. July 29, 2008) (Lawson, J.)(citing 20 C.F.R. § 404.1560(b)). "The ALJ may choose to rely on the VE's testimony in complex cases, given the VE's ability to tailor h[is] finding to an 'individual's particular residual functional capacity. " *Beinlich v. Commissioner*, 345 Fed.Appx. 163, 167, 2009 WL 2877930, at *4 (6th Cir.Sept.9, 2009)(citing *Wright v. Massanari,* 321 F.3d 611, 616 (6th Cir.2003)). "The function of the VE is to advise the ALJ of jobs found among various categories of employment which the claimant can perform with h[is] limitations." The hypothetical question and corresponding VE testimony, if adopted by the ALJ, must accurately reflect the claimant's degree of limitation. At Step Four, "the propriety of the hypothetical question ... is a proper concern for the Court, since it may furnish relevant information that the ALJ may consider in determining whether the plaintiff could do her past work." *Merkel*, at *4.

hypothetical question to the VE. *Stanley v. Secretary of Health and Human Services,* 39 F.3d 115, 118–119 (6th Cir.1994). However, the ALJ's rationale for rejecting a portion of Plaintiff's most critical limitations is not supported by substantial evidence. The hypothetical restriction precluded work requiring "depth perception" and "fine close work" is vastly inadequate to account for chronic visual disturbances preventing Plaintiff from discerning faces, reading newspaper print, or seeing images on television (Tr. 51). Likewise, the manipulative limitations found in the hypothetical question precluding "forceful gripping or twisting with the hands" does not fully address the limitations created by bilateral CTS (Tr. 51). As discussed above, the ALJ's finding that Plaintiff's activities undermined her allegations of limitation is based on a highly selective if not distorted account of the testimony.

In contrast, it is unclear whether the failure to reference Plaintiff's psychological limitations in the hypothetical question, standing alone, provides a basis for remand. While the hypothetical question forming the basis of the RFC makes no mention of psychological limitations, the VE testified later that if the same hypothetical individual were limited to "simple routine tasks in a low stress environment defined as not quick decision-making, and no quick judgment required on the job, . . . no interaction with the public, and only minimal interaction with co-workers," the individual could perform Plaintiff's past work as a cleaner (Tr. 53). Because the alternative hypothetical question appears to acknowledge that an individual with some level of psychological limitation could perform the work of a cleaner, it is possible that such modifiers are sufficient to address the symptoms of depression. However, because the other errors discussed herein provide grounds for remand, the ALJ should, on remand, reassess the degree to which Plaintiff's psychological limitations should be included in the hypothetical question and the RFC.

While a remand to the administrative level is warranted for the above-discussed reasons, I decline to recommend a remand for an award of benefits. A remand for an award of benefits is appropriate "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher v. Sec'y of Health & Hum. Servs.,* 17 F.3d 171, 176 (6th Cir.1994). While the errors discussed herein strongly support a remand, a remand for benefits prior to the resolution of the unresolved factual issues would be premature. As such, I recommend a remand for further administrative proceedings consistent with this Report.

## CONCLUSION

For the reasons stated above, I recommend that Plaintiff's Motion for Summary Judgment be GRANTED to the extent that the case is remanded for further fact-finding and that Defendant's Motion for Summary Judgment be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

                                                                     s/ R. Steven Whalen  
                                                                     R. STEVEN WHALEN  
                                                                     UNITED STATES MAGISTRATE JUDGE  
Dated:  February 29, 2016

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on February 29, 2016, electronically and/or by U.S. mail.

                                                                     s/Carolyn M. Ciesla  
                                                                       Case Manager to the  
                                                                       Honorable R. Steven Whalen